Good morning, may it please the court. Armando Mendez on behalf of defendants appellates Jennifer McFall and Earl McFall. The district court erred when it found that the note in question was clear and unambiguous and that it was not susceptible to any other reasonable interpretation. My clients assert that the crux of the ambiguity in the note is the meaning of training fees in the contract. The note itself can be found in ER 214 Exhibit A, Declaration of Sandra Nelson, and in particular the ambiguity is found in the second to last sentence which says, in lieu of simple interest payment of 4% per year fixed for the life of the loan and payable monthly on the first of the month, Earl and Jennifer are asking to waive the monthly training fees. Why is that ambiguous? Because the training fees were known by all the parties at the inception when the money was loaned and the evidence for that is that Ms. Nelson signed training fee contracts that were included in the Declaration of Jennifer McFall, that is at ER 118 Exhibit A, that beginning in 2005, the value of the training fees were known. Under California law, those two documents need to be taken together because they form substantially the same transaction, Civil Code 1642. An analogy that I would use would be a deed of trust in a California. Those two documents are to be taken together. One explains the other. What evidence did the McFalls submit at the time of their intent, at the time of the contract was signed? Well, there's an actual conflict with regard to when the contract was signed. Ms. Nelson testified in deposition that the contract wasn't signed until 2007. It was backdated to 2005. The McFalls assert that the contract was signed on May 1st, 2005, the same day. It was signed on May 1st, 2005, and it was never backdated. That's corroborated by the testimony of Ms. Nelson's accountant who says, look, as soon as I saw the check come in, the note existed. And so without determining, there's a factual dispute as to when the note was actually signed between the parties. So it's a difficult question to answer, and that has to be determined by a jury or a judge sitting at the back of the court. Why should that make a difference, when it was actually signed? Because California law says that the circumstances surrounding the time that it was signed are important to determine the party's intentions. And that's 1860, also the civil codes, 1635 et sec, give the court the ability to take a look at these statutes and interpret what the parties intended at the beginning of the inception of the agreement. And when there's a conflict as to when the note was actually signed, that is ripe for a jury or a fact or a judge sitting as a fact finder, not at summary a fact that deserves a trial. That's not the only thing that we can look at with regard to construction of this note. But it seems — I'm sorry. I'm just trying to understand your argument, because it seems like most of the evidence either speaks to a different party's understanding of the contract or — such as Nelson's understanding or show, it seems, at best, intent to modify the contract much later than the time of signing. So I'm just trying to figure out why you would think — Correct. And there is a conflict when the — at the time of signing. If we look at the deposition that was submitted of Ms. Nelson's assertion of when it was signed, she says it was backdated. She said it was 2007 when she requested that a note be made, and then that it was backdated to May 1, 2005. My clients assert that it was signed on May 1, 2005. So it's difficult to determine what the intention of the parties were. It's not — the exchanges of the e-mails that occurred in 2007 are not evidence of a modification from our position. They're evidence that Ms. — Ms. Nelson was asserting that there was no note at all. There was a note that existed in May — on May 1, 2005. And that's what we would present at trial. The issue of modification came later, though, as not in 2007. Isn't that correct? Well — I thought that was the communication between Mr. Chang and either Ms. Nelson or somebody on behalf of Ms. Nelson. Wasn't that significantly later in time? That's true. 2007 is when my clients assert that Ms. Nelson was attempting to modify the — the note. The — Ms. Nelson asserts that in 2009, it was Mr. Chang that was attempting to modify the note. But this is not an issue of modification, Your Honor. It's an issue of when it was created. And our position is that it was created in — in May of 2005, at a time when Ms. Nelson knew exactly what the value of a training fee was, because she signed training fee agreements. But she would have known that whether it was in 2005 or 2007, wouldn't she? She would have. Would that make any difference? She would have known that whether it was 2005 and 2007, yes. She asserts that a training fee is worth $500, and you're paying interest only. My clients assert that a training fee is worth what the training fee contracts that she signed say, which ranged between $775 and $975. But that was the retail price. So it's — it's not unusual for somebody to say, I'll take in kind, rather than pay the retail price. I don't see what the difference is, whether it's wholesale or retail. I don't see the significance of that. I think that — So your position is, if the — if the training fees went up during this period, that would be a further offset to the principal. Yes. But Ms. Nelson knew about the fees. If they would have gone up, she would have signed an agreement. She actually signed an agreement every time she placed a horse that the fees were X amount of dollars. And it — And McFaul had the option under the agreement to either pay the interest or not pay the interest and not get paid the fees. McFaul had the option — our position is McFaul had the option to pay the interest $500 a month and gave two training fees, which had a specified amount pursuant to the — to the training contracts that Ms. Nelson signed. Which the specified amount may be higher than $500. It would be higher than $500. And it would go down to knock down the principal. Why? Where is that in the contract, that it goes down to knock down the principal? It's not in the contract. That's why it's ambiguous. That's — But you argue that the — or at least I believe you argue that the horse training contracts should be read in conjunction with the promissory note. That's right. But do the — these contracts have any bearing on the note outside of simply stating the price of the horse training fees? I'm not quite sure how that tells us about the party's intent. Because when the May 1, 2005, note was signed, and our position is it was signed on that date, Ms. Nelson understood exactly what she was paying for training fees. So they used the term training fees when everybody knew the value of it. Ms. Nelson understood the value of it. The McFaul understood the value of it. They could have defined training fees to say, pursuant to the signing — the training fee contracts you are signing, my clients would have been in a position to basically not pay this loan off at all, pay $500 interest, and given away $775 times two of training fees every month. It just doesn't make any sense whatsoever. Well, there might be other reasons why the McFauls would have wanted to do that. Maybe there was some other benefit that they would have derived from having Ms. Nelson's horses there at their — That's true, but the evidence shows that their intention was to make sure that they were paying off the note by giving them the bigger chunk, the training fees waiver, and applying it. Where is that in the record, that that was their intention? Well, the evidence is in the training fees agreements and also the invoices that were specifically said credit — credit training fees times two, a certain amount. She was invoiced. Now, she asked for that to be modified in 2007 to say, look, why don't we call it interest? That was a request that she made, and that was in an e-mail that she sent Mr. Chang on Exhibit Record 94, Exhibit D. Mr. Mendez, we've taken you past your time. Thank you very much. Thank you. Good morning. May it please the Court. David Rose on behalf of Sandra Nelson. I don't have a whole lot additional to say that I put in my brief, but Judge Delaney in her decision repeatedly referred to the plain language of the promissory note, and that's what the Court interpreted, the plain language of the promissory note. And as Judge Delaney pointed out, the plain language of the promissory note nowhere suggests that training fees can be used to reduce the principal. The McFalls controlled the training fees. That was in their discretion. They could raise it at their discretion. They could have doubled it. They could have tripled it, which would have meant instead of repaying $150,000, they would pay substantially less than that based upon their unilateral determination of a training fee. It's also important to point out in background that Sandra Nelson at various times, for the most part, had like seven horses that were being trained. So she was paying for at least five training fees. So it wasn't a losing proposition at all for the McFalls. They were making good money off of Sandra Nelson. And the purpose of the promissory note was so that they could purchase the farm that they started this business. So they borrowed money from the client, agreed to pay $150,000 in a lump sum at the end of the term, and they defaulted on that. Once again, the plain language is simple. In lieu of, that language means instead of, in place of, in lieu of simple interest, $500 a month, that apparently they couldn't afford or they would have chosen that option, they had the option of waiving two training fees, which they consistently did in invoices up until 2009 when they said, well, this isn't working out very well, so why don't we modify the contract and we'll amortize the loan. That was first raised in 2009, some five, almost five years after the inception of the note. So.  It was, yes, emails from Mr. Chang, who was the accounting manager for Dragonfire, and it was also in discussions. And so, once again, the language of the note is pretty clear that in lieu of, they could waive two training fees. And summary judgment is peculiarly suitable for promissory note cases because the overarching goal is to interpret the language of the note, which, as we pointed out, was drafted by Mr. Chang, the father of Jennifer McFall. And we don't believe that there's any ambiguity in the promissory note. It's the plain language, as Judge Delaney said. However, if there were an ambiguity, which we don't believe there was, it's interpreted under California law against the drafter, which was the McFalls. So that, they lose on that one as well. Can I ask you, is there any difference in the admissibility standards under common law as set forth in Pacific Gas and Electric Company versus GW Thomas Drainage and California's payroll evidence rule that is set forth in the California Code? Is there any difference between how we apply the common law as set forth in Pacific Gas versus the payroll evidence rule? Because it requires the judge to look and see whether or not, give just a preliminary look and see whether or not the evidence is going to make a difference or look into how the interpretation of the contract, what the parties, how they should have interpreted what their intent was and how the court should interpret that. I don't, if I understand the question correctly, I don't think that there's a difference under that case that you've cited. The court interpreted the language of the promissory note, which was not long. It's a fairly short note. And it interpreted the note based upon the language and the subsequent conduct of the parties after the execution of the promissory note was consistent with the plain language of the note. Yeah. And I guess, I think I understood the McFaul's counsel here to be arguing that this is a factual question because the district court engaged in improper factual finding. But I think the district court is supposed to provisionally receive without actually admitting all the credible evidence concerning the party's intentions to determine if there is ambiguity. And I think we're supposed to apply Pacific Gas. And I was just wondering if there's a difference between Pacific Gas and how the court did this and the payroll evidence rule. I don't think there's a difference. But your position is that the extrinsic evidence did not support a meaning to which the language of the instrument is reasonably susceptible because the language of the instrument is clear on its face. That's correct. That's all I have. Thank you very much. All right. The case of Nelson v. McFaul will be marked submitted. Thank counsel for their argument.
judges: Bea, Murguia, Soto